M. J. Haden
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          vs.<br><br>JOSHUA DAVID WOLFE,<br><br>                    Defendant. | Case No. 4:06-cr-0017-RRB-TWH<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |


Defendant, Joshua David Wolfe, by and through counsel M. J. Haden, Assistant Federal Defender, files the following sentencing memorandum to aid the Court at the imposition of sentencing hearing scheduled for Friday, July 27, 2007, in Fairbanks, Alaska.  Mr. Wolfe respectfully requests that this Court impose a sentence of 84 months. In determining the appropriate guideline range and sentence, Mr. Wolfe asks that this Court consider the United States Sentencing Commission's May 2007, Report to Congress: Cocaine and Federal Sentencing Policy,[1] and the newly-promulgated

---

[1] http://www.ussc.gov/r_congress/cocaine2007.pdf

amendment that lowers guideline ranges for crack cocaine offenders by two offense levels, in addition, to the sentencing factors contained in 18 U.S.C. § 3553.

## I.    INTRODUCTION

A court shall "impose a sentence sufficient, but not greater than necessary" to fulfill four primary objectives:

> (A)    retribution (to reflect the seriousness fo the offense, to promote respect for the law, and to provide "just punishment");
>
> (B)    deterrence (both for the defendant and society as a whole);
>
> (C)    incapacitation ("to protect the public from further crimes"); and,
>
> (D)    rehabilitation ("to provide the defendant with needed educational training ro vocational training, medical care, or other correctional treatment in the most effective manner.")

Title 18 U.S.C. §3553(a)(2); United States v. Booker, 543 U.S. 220 (2005).

## II.    THE § 3553 FACTORS REQUIRE A SENTENCE OF NO MORE THAN 84 MONTHS

A.    Mr. Wolfe's Desire for Rehabilitation Favors an 84-Month Sentence.

Mr. Wolfe was born into a criminal and drug infested environment. His mother is a drug addict. She has spent the better part of her life incarcerated, going in and out of Joshua' life. His father was absent, meeting Joshua only once. From the time he

was a toddler and throughout his teenage years, Mr. Wolfe was in and out of foster care due to his mother's inability to care for him.  When Joshua was approximately six years old, his mother brought him to Fairbanks.  During his time in Alaska, there were 31 referrals to the Division of Family and Youth Services reporting everything from neglect to physical and sexual abuse.  PSR ¶ 62-74; Exhibit A, Letter of Anise Masterson

As Mr. Wolfe entered his teen years, his conduct imitated that of the people around him.  He begin to abuse drugs and alcohol and committing petty theft.  He was undisciplined and out of control.  Petty theft soon escalated into burglary.  Drug use turned into dealing.  The cycle of criminal activity demonstrated by his family instability had rolled over to Joshua's life.

In September of 2005, at the age of 22, Joshua made two hand-to-hand sales of crack cocaine to a DEA confidential informant.   He knew he was in trouble.  He was contacted by the DEA and went in to meet with them.  He spoke candidly of his involvement in the drug world.   Surprisingly, he was not arrested, but released.  Scared that he would be imprisoned, or worse, that his fellow drug dealers would seek retaliation, he fled.

In early 2006, Joshua ran to Arizona then Oregon with his fiancee, Christina Ellis.  In Oregon, Joshua found employment doing construction.   When he learned that Christina was pregnant, he vowed to stay out of trouble.  He became a father figure to Christina's five year old daughter, taking care of her as if she was his own.  Exhibit A, Letter of Christina Ellis. Then in summer of 2006, an event happened that changed Joshua's perspective on life – the birth of his son.  Exhibit B, Family Pictures.  Joshua was

determined that his son would not have to endure the life that he had been exposed to.

Joshua knew that he had to face the consequences of the criminal charges he faced in

Alaska before he could move on with his life and be a father to his son. In March of 2007,

Joshua returned to Fairbanks and turned himself in to the DEA to face the current charges.

Even his family has noticed the change in him. Their observations are reflected in the

outpouring of letters on his behalf. Exhibit A. Excerpts from those testimonials include:

- "I've just have seen how much he's turned his life around since the birth of his son. That little boy means everything to him, and I can tell Joshua is ready to live legitimately. His priorities lay with his son and family, and that is why he turned himself in. He wanted to get it over with, so he could move on with his life , and be able to be a role model for his son." Exhibit A, letter of Amanda S. Wolfe.

- "Joshua is a new father and sees the importance of family and responsibility . . .Joshua wants a better life and his actions in the past year have shown that." Exhibit A, Letter of Helen Freeman.

- "I was unaware that Josh had gotten in trouble and was avoiding his consequences when he came to see me at Christmas. He had brought his Fiancé, her daughter and his new little baby Javon. He was here for about a week , and even after day one, the changes were obvious. He had a new outlook on life, he valued his family and put them on a pedastel (sic). He wasn't the young troubled teen I had seen in years past. . .Joshua seemed focused and clear minded." Exhibit A, Letter of Shirley Kinley.

- "I truly believe that the decision to turn himself in is itself a huge stepping stone to being a better person. I know that Joshua could have run for ages, all the while getting to be with his young son everyday. But I also know that the thought of being a criminal his whole life, while looking into his sons (sic) eyes everyday, weighed too much on Joshua and he has finally made the RIGHT decision." Exhibit A, Letter from Anise Masterson.

Mr. Wolfe has certainly had a troubled past. He has exhibited genuine

concern of breaking the pattern of criminal activity that had shadowed over him his entire

life. As Mr. Wolfe is facing imprisonment from not only the charges that are before this

Court, but also a probation revocation in the state based on the same conduct, a sentence of 84 months is an appropriate sentence to meet the factors set forth in 18 U.S.C. § 3553.

B.  The 100:1 Powder/Crack Ratio Results in Sentences that are Longer than Necessary and Create Unwarranted Sentencing Disparities.

Mr. Wolfe will be separated from his family for a considerable amount of time. Under the sentencing guidelines, as they stand today, he faces a sentence of at least 100 months. Such a harsh penalty for a non-violent drug offense stems from the so-called "100:1 ratio" for powder versus crack cocaine crimes, i.e., a five-year mandatory minimum is triggered by possession with intent to distribute 500 grams of powder cocaine but only 5 grams of crack cocaine. 21 U.S.C. § 841(b)(1)(B). The stark sentencing disparity originated in the Controlled Substance Act of 1986, a law enacted in a "frenzied" political climate in which legislators sought to quell a perceived crack cocaine "epidemic" in American communities. King & Mauer, Sentencing with Discretion: Crack Cocaine Sentencing After Booker at 8-9, The Sentencing Project (January 2006) hereafter, "Sentencing with Discretion")[2]

In 1987, the United States Sentencing commission crafted sentencing guidelines that mirrored the 100:1 powder-to-crack ratio. While congress did not state how the 100:1 ratio should affect sentences on cocaine amounts in excess of those triggering mandatory minimums, the commission implemented the ratio for each sentencing range graduation. The result is the perpetuation of the stark disparity within every guideline range. For example, defendants who are convicted of possession with intent to distribute

---

[2] http://www.sentencingproject.org/PublicationDetail.aspx?PublicationID=327

between 20 to 35 grams of cocaine base or between 2 to 3.5 <u>kilograms</u> of powder cocaine both fall within Offense Level 28.

Over the past decade, the Sentencing Commission has repeatedly criticized the 100:1 ratio. <u>United States v. Pickett</u>, 475 F.3d 1347 (D.C. Cir. 2007) ("When it comes to application of Guideline § 2D1.1 in crack cocaine cases, the commission is one of its severest critics"). In 1995, the commission proposed adopting a 1:1 equivalence between crack and powder cocaine. 60 Fed. Reg. 25074, 25077 (1995). In 1997, the commission and the Attorney General proposed a 5:1 ratio, and the Clinton Administration proposed a ratio of 10:1. <u>United States v. Fisher</u>, 451 F. Supp. 53 (S.D.N.Y. 2005).

In 2002, the Commission again unanimously found that the 100:1 ratio was "unjustified." U. S. Sentencing Commission, <u>Cocaine and Federal Sentencing Policy</u> (May 2002) at 91 (hereinafter "2002 Report").[3] The Commission also stated that the ratio "fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 [Drug] Act." <u>Id</u>. The Commission concluded that the "intrinsic harms posed by the two drugs (<u>e.g.</u> addictiveness)" did justify some degree of difference in base-offense levels, which could be reflected in a ratio of roughly 20:1. <u>Id</u>. at 93, 100, 106.

The Sentencing Commission's decade-long criticism of the 100:1 ratio is rooted in empirical data that clearly demonstrates: (1) the ratio serves no policy or legislative objectives, and (2) the ratio is the single greatest factor behind the racial disparity in federal sentencing. In turn, the 100:1 ratio contravenes the Sentencing Reform

---

[3]   http://www.ussc.gov/r_congress?02crack/2002crackrpt.htm

Act in that it produces sentences that are "greater than necessary" to fulfill the statutory goals of sentencing and it creates "unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a),(a)(2),(a)(6).  Consider the following:

First, the pharmacological differences between powder and crack cocaine fail to account for the wide disparity in penalties.  A recent Sentencing Commission report confirms its longstanding position that "the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine."  Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform at 131 (2004) (hereafter "Fifteen Year Report") (Chapter Four).[4]  The report states that "[r]ecent research has demonstrated that some of the worst harms thought to be associated with crack cocaine use. . . are not as severe as initially feared and no more serious from crack cocaine exposure than from powder cocaine exposure."  Id.  This finding buttresses the Commission's previous statements that, whether in powder or crack form, "cocaine produces the same physiological and psychotropic effects."  Diana Murphy, Statement to Senate Judiciary Committee, May 22, 2002, reprinted in 14 Fed. Sen. Reptr. 236, 239 (Nov./Dec. 2001 - Jan./Feb. 2002).

Second, "[m]ost crack cocaine offenders. . .are street dealers" and "do not fit the category of serious or high-level trafficker that Congress described when initially establishing the [mandatory minimum] penalty levels."  Fifteen Year Report at 132.  As the

---

[4]    A copy of the report is available at http://www.ussc.gov/15_year/15year.htm.

Commission has noted, "[f]or no other drugs are such harsh penalties imposed on such low-level offenders." Id. The high penalties resulting from the 100:1 ratio, far from imprisoning the most deserving offenders, "appear to be misdirecting federal law enforcement resources away from serious traffickers and kingpins toward street-level retail dealers." Id. Statistics bear this out. For instance, "[t]he 500 grams of cocaine that can send one powder defendant to prison for five years can be distributed to eighty-nine street dealers who, if they converted it to crack, could make enough crack to trigger the five-year mandatory minimum for each defendant." William Spade, Jr., Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy, 38 Ariz. L. Rev. 1233, 1249 (Winter 1996) (emphasis added).

Third, although legislators believed crack was associated with other harmful or violent conduct, the Commission's data indicates that "aggravating conduct occurs in only a small minority of crack cocaine offenses" and it "does not differ substantially from the prevalence in powder cocaine offenses." Murphy, supra, at 238.

Notably, on April 18, 2007, the Sentencing Commission voted in favor of an amendment which modifies the penalties for crack cocaine offenses. According to a press release, "[t]he Commission described the problems associated with the [100:1] drug quantity ratio as so urgent and compelling that it promulgated the guideline amendment as a measure to alleviate some of those problems." 4/27/07 U.S.S.C. Press Release at 2. Essentially, the amendment lowers the guideline drug quantity thresholds by two levels. For example, a first-time offender with five grams or more of crack is currently subject to a sentencing range of 63-78 months (Level 26). Under the revised guidelines, the same

offender would be placed in a range of 51-63 months (Level 24).  The mandatory minimum would remain in place.  Id.  The Commission emphasized that the amendment "is only a partial solution to some of the problems associated with the 100:1 drug quantity ratio."  Id.

A comparison of Mr. Wolfe's guideline range to the comparable range for possession with intent to distribute powder cocaine spotlights the existing disparity in sentencing.  Mr. Wolfe's offense level for possession with intent to distribute 23.9 grams of crack cocaine is 28.  Had he been convicted of possessing the same amount of powder cocaine, his offense level would be 12.  In turn, his sentencing range, after a two-level adjustment for acceptance of responsibility, would fall to 21-27 months imprisonment with no mandatory minimum.  See Table 1, below.

### Table 1:  Sentencing Disparity For Like Amounts of Powder and Crack Cocaine

|  | Powder (23.9 g) | Crack (23.9 g) |
|---|---|---|
| Offense Level | 12 | 28 |
| Acceptance | -2 | -3 |
| Adjusted Level | 10 | 25 |
| Criminal History | V | V |
| **Guideline Range** | **21-27 months** | **100-125 months** |

Further, under the newly-promulgated crack cocaine guideline, Mr. Wolfe's guideline sentencing range would fall near the 60-month mandatory minimum. See Table 2, below.

**Table 2: Ranges for Crack Cocaine Offenses**
**Under Current & Amended Guidelines**

|  | Current | Amended |
|---|---|---|
| Offense Level | 28 | 26 |
| Acceptance | -3 | -3 |
| Adjusted Level | 25 | 23 |
| Criminal History | V | V |
| **Guideline Range** | **100-125 months** | **84-105 months** |

Mr. Wolfe does not ask this Court to construct an alternate range based <u>only</u> on a lower powder-to-crack ratio.  <u>See</u>, <u>e.g.</u>, <u>United States v. Jointer</u>, 457 F.3d 682, 687 (7th Cir. 2006) (holding that district court erred by imposing below-guidelines sentence based solely upon modified 20:1 powder-to-crack ratio rather than "[tying] [all of] the § 3553(a) factors to the individual characteristics of the defendant and the offense committed") (citations omitted); <u>but</u> <u>cf</u>. <u>United States v. Gunter</u>, 462 F.3d 237 (3rd Cir. 2006) ("[T]here is nothing special about the crack cocaine sentencing guidelines that makes them different, or less advisory, than any other guidelines provision.")

Rather, in crafting the appropriation § 3553(a) sentence, he asks that this Court consider the Sentencing Commission's repeated excoriations of the 100:1 ratio and its recent amendments narrowing the unwarranted ratio.  Also, Mr. Wolfe submits that this Court should consider that the bases for such criticisms are embodied in his case.

While Mr. Wolfe is convicted of distributing crack cocaine, there is no evidence that he was a "kingpin."  Rather, the facts of this case suggest that Mr. Wolfe was a "street level retail dealer."  Also, there is no indication that Mr. Wolfe used violence in the

course of his activities.  The confidential informant who purchased drugs from Mr. Wolfe did not report seeing – much less being threatened with – a gun or dangerous weapon during the buy.  In fact, no gun was ever found in Mr. Wolfe's possession.  Due to the absence of such aggravating factors, a guidelines sentence exceeds that which is necessary to satisfy the statutory goals of sentencing.  Rather, a sentence of no more than 84 months is justified.

## III.     CONCLUSION

For all the reasons stated above, Mr. Wolfe respectfully requests that the Court impose a sentence of 84 months imprisonment, five years supervised release, and a $200 special assessment.  In addition, Mr. Wolfe asks that the Court strongly recommend that he be allowed to participate in the 500-hour drug and alcohol program. And finally, Mr. Wolfe requests that the Court make a judicial recommendation that he be designated to FCI Sheridan so that he may be close to his fiancé and son.

DATED this 23rd day of July 2007.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ M. J. Haden
Assistant Federal Defender
Alaska Bar No. 0607047
601 West Fifth Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mj_haden@fd.org

Certification:

I certify that on July 23, 2007, a copy of the
foregoing document, with attachments, was
served electronically on:


Bryan Schroder, Esq.


/s/ M. J. Haden